John P. SMITH et al.

v.

James F. BOYD, Jr., M.D. et al.

No. 88–224–Appeal.

Supreme Court of Rhode Island.

January 19, 1989.

James M. Sloan 3rd, Gardner, Sawyer, Gates & Sloan, Providence, for plaintiffs.

Roderick A. Cavanagh, Wakefield, Douglas A. Giron, Hinckley, Allen, Snyder & Comen, Providence, for defendants.

## OPINION

MURRAY, Justice.

This case is an appeal by the defendants James F. and Virginia Boyd, and the defendant-intervenors, Philip and Patricia Durigan. The case was tried in the Superior Court by a justice sitting without a jury. The trial court judgment permanently enjoined the Boyds from selling their Narragansett realty to the Durigans, and required them to convey instead to the plaintiffs. We reverse.

The record contains the following pertinent facts. The Boyds own a Cape Cod house on Boston Neck Road in the town of Narragansett. The Boyds decided to sell their house. On January 28, 1988, they listed the home for $325,000 with a real estate broker, Joan Carter. The Boyds discussed with Carter their willingness to include various appliances with the house. They received a written offer to purchase their home by prospective buyers, the Duxburys, but the sale was never completed.

On February 21, 1988, the Smiths viewed the Boyd's house accompanied by their realtor, Gerald Connors. Later that day, Joan Carter called the Boyds and told them that the Smiths were interested in purchasing the house and certain items of personalty for $325,000. The items of personalty were the refrigerator, stove, washer, dryer, dining room draperies, and bedroom curtains. The Smiths and Boyds negotiated over these items through their respective brokers. The parties agreed on a possible closing date of April 25, 1988. Joan Carter filled out a standard purchase-and-sales-agreement form. She filled in the blanks with the items of personalty and the closing date, and the Smiths signed the form.

Meanwhile, the Durigans had visited the Boyds' home with their realtor, Muriel Sullivan. The Durigans decided that they would like to purchase the house. They did not request to purchase any personalty. Sullivan made up a purchase-and-sales-agreement form. She filled out the blanks in the form and filled in April 25, 1988 as the date of closing. The Durigans signed the form.

Joan Carter delivered the two purchase-and-sales-agreement forms to the Boyds simultaneously. She told them that they could accept either or reject both. The Boyds decided to accept the Durigans' offer, and reject the Smiths'. The Boyds signed the Durigans' purchase-and-sales-agreement form. The Smiths then commenced an action seeking specific performance of their alleged oral contract to purchase the Boyds' home.

This case presents the issue of whether the trial justice erred in finding that the discussions between the Boyds and the Smiths progressed beyond negotiations to form a contract. We believe that a contract was never formed. Our discussion will be in two parts. First, we shall consider the applicability of the statute of frauds. Second, the issue of whether a contract was consummated will be examined.

I

■ The first statute of frauds was enacted by the British Parliament. *See* Farnsworth, *Contracts* § 6.1 at 370 (1982). The purpose of the statute was to prevent perjured testimony with respect to oral contracts. *Id.* Rhode Island's statute of frauds also is to guard against perjury by one claiming under an alleged agreement. *Peacock Realty Co. v. E. Thomas Crandall Farm, Inc.*, 108 R.I. 593, 601–02, 278 A.2d 405, 409–10 (1971). The Rhode Island statute of frauds is found in G.L.1956 (1985 Reenactment) § 9–1–4, which provides:

"Statute of frauds.—No action shall be brought:

\*　　\*　　\*　　\*　　\*　　\*

(6) Whereby to charge any person upon any agreement or promise \* \* \* upon the sale of any interest in real estate, unless the promise or agreement upon which such action shall be brought, or some \* \* \* memorandum thereof, shall be in writing, and signed by the party to be charged \* \* \* or by some other person by him \* \* \* lawfully authorized."

Hence to create an enforceable contract for the sale of realty, such contract must be in writing, or otherwise satisfy the writing requirement under § 9–1–4.

As the statute of frauds requires a writing, the issue arises as to what constitutes a sufficient writing. We previously have held that an admission under oath of the disputed contract by the party to be charged may be used to remedy a writing that by itself would be insufficient. *Peacock Realty Co.*, 108 R.I. at 601–02, 278 A.2d at 409–10; *see also Radke v. Brenon*, 271 Minn. 35, 40–41, 134 N.W.2d 887, 891 (1965). We later expanded this doctrine in

*Adams–Riker, Inc. v. Nightingale*, 119 R.I. 862, 383 A.2d 1042 (1978). In *Adams–Riker* we adopted the rule that a complete admission of the contract in court by the party to be charged dispenses with the necessity of any writing. *Id.* at 866–67, 383 A.2d at 1044; 2 *Corbin on Contracts* § 498 at 683 (1950); *see also Sealock v. Hackley*, 186 Md. 49, 52–53, 45 A.2d 744, 746 (1946). The rationale behind *Adams–Riker* is that the purpose of the statute of frauds is to prevent perjurious claims. However, to allow the statute to excuse a party's performance, when such party admits all elements essential to a valid contract, does not involve a perjurious claim and would create an injustice. *Adams–Riker, Inc.*, 119 R.I. at 867, 383 A.2d at 1044–45. Our decision today is in accord with *Adams–Riker*.

The applicability of the statute of frauds to the case at bar turns upon whether a contract was consummated. We note that *MacKnight v. Pansey*, 122 R.I. 774, 786, 412 A.2d 236, 243 (1980) holds that the seller of realty must admit under oath the existence of the contract to satisfy the statute of frauds. If Dr. Boyd admitted all elements necessary to a contract under oath, and hence, in effect the existence of the contract itself, we would hold such an admission a sufficient writing and enforce the contract. We now turn to an examination of whether such admission took place.

## II

A contract is a consensual endeavor. Farnsworth, § 3.1 at 106. To form a valid contract, each party to the contract must have the intent to promise or be bound. *J. Koury Steel Erectors, Inc. v. San–Vel Concrete Corp.*, 120 R.I. 360, 365, 387 A.2d 694, 697 (1978); Farnsworth, § 3.1 at 106. In general, assent to be bound is analyzed in two steps: offer and acceptance. Farnsworth, § 3.3 at 108. Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such assent a contract is not formed. *See Ardente v. Horan*, 117 R.I. 254, 258–59, 366 A.2d 162, 165–66 (1976); Restatement (Second) *Contracts* § 22 at 66 (1981); 1 *Williston on Contracts*, § 64 at 211–12 (Jaeger 3d ed.1957).

There are two types of intent to contract: objective and subjective. Farnsworth, *Contracts* § 3.6 at 113. In general, it is a party's objective intent that will be considered as creating either an offer or acceptance. *Bergstrom v. Sambo's Restaurants, Inc.*, 687 F.2d 1250, 1256 (8th Cir.1982); *Camrex Contractors Ltd. v. Reliance Marine Applicators, Inc.*, 579 F.Supp. 1420, 1426 (E.D.N.Y.1984). That is, this court shall look to an external interpretation of the party's or parties' intent as manifested by action. On this topic, Judge Learned Hand wrote:

> "A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by * * * force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent." *Hotchkiss v. National City Bank*, 200 F. 287, 293 (S.D.N.Y.1911).

Hence, in order for an offer or acceptance to occur, the party must manifest an objective intent to promise or be bound. Sometimes, however, the individual or subjective intent of a party will be indicative of objective intent. Thus, although it is objective intent that controls in contract formation, subjective intent may be one of the factors which comprises objective intent.

There are instances in which a party intends that his agreement to terms of a contract will have no legal consequences. In this situation, there is no intent to be bound. Farnsworth, § 3.7 at 116–17. In general, courts will honor such intent not to contract if the other party has reason to know of it. *Id.* One instance in which parties may not wish their assent to particular terms to form a contract is when a written instrument is contemplated. The Supreme Court of Maine has held:

> "If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the

written draft be omitted. If on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound until the signatures are affixed." *Mississippi & Dominion Steamship Co. v. Swift*, 86 Me. 248, 258, 29 A. 1063, 1066–67 (1894); *see also Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *R. G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984).

Thus, where the parties understand that a written instrument is to be executed, whether an oral contract is formed may turn upon whether the party denying the contract manifested an objective intent to be bound before signing the written instrument. We hold that when the parties to an agreement understand that the agreement is to be reduced to writing, and extensive preparation or performance has not begun, the burden of proof to show an objective intent to be bound before execution of the written contract is on that party who wishes to enforce the alleged oral contract.

An important policy underlies today's holding. Business transactions require that parties to a contract be able to negotiate without fear that they will be bound by mere discussion. In circumstances where the parties understand that the agreement is to be reduced to writing, and extensive preparation or performance has not begun, the parties to a contract need autonomy to determine whether a bargain will be struck before or upon the execution of such written contract.

■ In determining whether a party's objective intent was to be bound before or upon execution of the written contract, one must examine the particular case. We shall consider, among other things, the practice of the trade or profession, the prior practice between the parties, whether the written contract was to be drawn up by persons other than the parties, and statements made during the negotiations. Most persuasive will be the fact that at the time of negotiation, a party states that he or she does not intend to be bound contractually until the written agreement is executed.

■ The findings of a trial justice sitting without a jury are accorded great deference and will not be disturbed unless the trial justice misconceived material evidence or was otherwise clearly wrong. *Miller v. Dixon Industries Corp.*, 513 A.2d 597, 601 (R.I.1986); *Dickinson v. Killheffer*, 497 A.2d 307, 312 (R.I.1985). Moreover, this principle applies to inferences and conclusions drawn by the trial justice with respect to the ultimate issues of fact derived from the testimony and evidence. 513 A.2d at 601. In the case at bar, we believe that the trial justice misconceived material evidence in determining that Dr. Boyd manifested an objective intent to enter into a binding contract before signing a purchase-and-sales agreement.

■ Applying the above-enunciated considerations to the case at bar, we note that it is a widespread real estate practice that an offer to purchase realty is made in writing by the purchaser's signature on a purchase-and-sales-agreement form, and a contract formed by the seller's countersignature on the same document. Indeed, Joan Carter did not believe the Smiths and Boyds had entered into a binding contract.

As far as the prior practice of at least the Boyds, Doctor Boyd testified that Carter was retained to solicit offers to buy the Boyds' house. This was also Joan Carter's understanding of her role. Prior to the Smiths' and the Durigans' offers, the Boyds received a written offer from other prospective buyers, the Duxburys. Thus it is logical for the Boyds to assume and intend that offers to buy would be made in writing, and that a deal would be consummated only upon their signing a purchase-and-sales agreement. In regard to the preparation of the purchase-and-sales agreement, Doctor Boyd testified:

"I have been involved in * * * several real estate transactions with Mrs. Carter, and I know that at some point in the transaction, when the prospective buyer is going to make an offer and put down a check, at that point an agreement is produced by somebody."

That is, Dr. Boyd believed that the offer would be made by the buyer executing the purchase-and-sales-agreement form. We believe Dr. Boyd's understanding of the transaction was a reasonable and objective view.

We note that as the written contract was to be drawn up by the realtors, the parties and their realtors had to discuss what was to be stated in the written agreement. The purchase-and-sales-agreement form is a standardized document, but nevertheless a real estate agent must fill in the blanks. To fill in the blanks, the appropriate information must be discussed by the parties and their agents. We are convinced that such discussion, considered alone, does not manifest an objective intent to contract before the written agreement is executed.

As far as the statements made during the negotiations, it is true that the Boyds and the Smiths did engage in some very specific discussion in regard to appliances, draperies, and the date of closing. In the complaint, the Smiths stated that:

"5. Plaintiffs on said date agreed to all of the terms of the sale, each term having been defined, and agreed to by the Defendants, and accepted by the Defendants."

Paragraph 4 of the defendants' answer admitted to the allegations in paragraph 5 of the complaint. However, that the terms of the sale were agreed to does not necessarily mean that the Boyds intended to be bound by such agreed-upon terms before they executed the written document. On the contrary, there is much evidence that the Boyds did not intend to contract before signing a written purchase-and-sales-agreement form.

We reverse the judgment below and its order of permanent injunction. The defendants' appeal is sustained, and the papers in this case are remanded to Superior Court.