DECISION
Lance Magnusen and Jeffrey Kindle (plaintiffs) bring this action seeking recovery of money damages suffered due to plaintiffs' reliance on an alleged oral agreement between George Stedman and Kim Carey (defendants) through their then-attorney Mark Sjoberg (Sjoberg) and the plaintiffs to cure the permanent encroachment of defendants' house on plaintiffs' land. The plaintiffs also seek monetary damages due to defendants' alleged breach of the covenants against encumbrances and of quiet enjoyment which accompanied the sale of the lot in question from defendants to Joseph R. Cappuccio (Cappuccio) and then to plaintiffs. While the complaint originally contained a claim for injunctive relief seeking the removal of the home in question, this count was dismissed by agreement immediately prior to trial. This Court, sitting without a jury, held a hearing on the merits of the matter on September 18 and 19, 1996. Jurisdiction is pursuant to R.I.G.L. § 8-3-14.
Facts and Travel
This dispute arises out of an alleged agreement to cure the permanent encroachment of defendants' home upon plaintiffs' land. Plaintiffs assert that defendants, through their attorney Mark Sjoberg, agreed to "swap" a section of land adjoining plaintiffs' property, which defendants owned, for the section of land which plaintiffs owned but on which a portion of defendants' house was located.
The plaintiffs, after entering into a purchase and sales agreement with Cappuccio in July 1987, purchased the property in question from Cappuccio by warranty deed on September 10, 1987, for $138,000. In July 1987 Cappuccio was not the owner of the lot involved, but he had entered into a purchase and sales agreement with defendants in May 1987 and later purchased the property on August 7, 1987, for $100,000. The defendants issued a warranty deed to Cappuccio for the property. For unknown reasons, Cappuccio is not a party to the present suit.
Plaintiffs purchased the lot from Cappuccio with the intent to subdivide the land and develop it as a residential cul-de-sac. They hired Wesley Grant, a surveyor and civil engineer, to survey the property and to develop the subdivision plans that needed to be filed with the South Kingstown Planning Board (Board) prior to the Boards' approving the creation of the subdivision. Grant testified that upon surveying the property in question for the third time he discovered that defendants' home was not, as previously believed, on the property line but was actually partially on plaintiffs' land. The first time the encroachment appears in the evidence is in plaintiffs' fourth set of subdivision plans dated June 28, 1989.
While plaintiffs assert that they sought and entered into the alleged land-swap agreement to cure defendants' encroachment upon plaintiffs' land, the evidence proves otherwise. Plaintiffs, in a December 21, 1987 letter from plaintiff Magnusen to Sjoberg, sent nearly two years prior to the discovery of the encroachment, requested that attorney Sjoberg examine Magnusen's plan for a land swap and help Stedman understand that the land-swap proposal would be beneficial to both Stedman and Magnusen. In this letter Magnusen makes it quite clear that his motivation behind the swap is not to cure the undiscovered encroachment but to take "a last stab at trying to complete this investment the way it is designed." Exhibit B. Attached to this letter is a lot map showing the lots involved that positions defendants' home on the dividing line between the two properties. Thus, it was sometime prior to this letter, and almost two years before the discovery of the encroachment, that plaintiffs requested a land swap, and the first time plaintiffs showed signs that their planned subdivision was potentially less profitable than they had originally planned. The evidence before the Court also reveals that after taking the possible land swap into account, the locations of the four lots in plaintiffs' subdivision shifted so that a previously unusable section of the subdivision could be developed. The developed lot sizes also increased. In plaintiffs' September 13, 1988 preliminary subdivision plan which placed defendants' home on the property line, lot one was 10,000 square feet, lot two was 10,130 square feet, lot three was 10,094 square feet and lot four was 15,490 square feet. In later plans illustrating the development after the proposed land swap, lot one is 11,500 square feet, lot two is 10,130 square feet, lot three is 14,155 and lot four 15,490 square feet.
It is also evident from this December 1987 letter that plaintiffs knew that at that time defendants would be the ones making the decisions, and that defendants were in no way amenable to the idea of a land swap. This first letter was followed by a series of communications between plaintiffs' attorney, Richard B. Carpenter (Carpenter), and Sjoberg. The most relevant letters include a November 3, 1989 letter from Sjoberg to Carpenter asking if the land swap deal was dead; a February 20, 1990 letter from Carpenter to Sjoberg stating that if the deeds included in the letter which would affect the swap were acceptable then plaintiffs would sign them; a March 30, 1990 letter from Sjoberg to Carpenter stating that he forwarded the proposed deeds to Stedman and another attorney; and plaintiffs' alleged "smoking gun" letter. In this letter from Sjoberg to Carpenter, Sjoberg stated that a few issues and details "need to be addressed prior to consummating the transaction." These issues include the specifics of the swapped land and whether any money will change hands. This letter was followed by another letter from Sjoberg to Carpenter asking if the swap was off. The last contact between the parties, prior to the filing of this suit, was October 24, 1990, when Carpenter wrote Sjoberg stating that if defendants did not sign the deeds, plaintiffs would file suit to evict defendants. This letter contained no mention of any "agreement" which bound the parties, or of a suit based on breach of an agreement. Sometime later plaintiffs' interest in the land was foreclosed, so that at present plaintiffs no longer own the property.
The Breach of Agreement Claims
Currently before the Court is plaintiffs' allegation that the previously discussed negotiations resulted in an oral agreement between plaintiff and defendant to swap land, which defendants later breached by failing to sign deeds that would effectuate the swap. In their post-trial memorandum plaintiffs allege that the complaint they filed not only sought monetary damages for defendants breach of an agreement to swap land but sought damages suffered as a result of the encroachment of defendants' house. While such a claim may have still been pending after Count I was dismissed, plaintiffs have produced no evidence at all as to what damages they have suffered based on the encroachment, separate and apart from their reliance on an agreement to swap land. Since no appraisals or marketability studies are before the Court to prove to what monetary extent the value of the land had been decreased, no trespass damages can be awarded.
This leaves the Court left to consider whether any agreement between the plaintiffs and defendants existed. The largest hurdle that plaintiffs must overcome is the statute of frauds. While plaintiffs contend that the statute of frauds is not applicable in the instant matter because plaintiffs are not seeking specific performance of the contract, such an argument is legally defective.
Section 9-1-4 entitled "Statute of Frauds" provides as follows:
 "No action shall be brought:
 "(1) Whereby to charge any person upon any contract for the sale of lands . . .
 ". . .
 "unless the promise or agreement upon which such action shall be . . . in writing, and signed by the party to be charged therewith, or by some other person by him thereunto lawfully authorized."
The statute divides those cases which fall within its requirements and those which do not based on the nature of the agreement, not the remedy sought for the alleged breach of the agreement. The agreement to swap land required exchanging deeds. It was, in every sense, one for the sale of land, even if it was a like-kind sale as opposed to a monetary sale. Smith v. Boyd,553 A.2d 131 (R.I. 1989). Simply because plaintiffs seek to recover money damages as opposed to specific performance of the contract does not remove the agreement from the statute of frauds. Thus, to meet this burden plaintiffs must produce a written memorialization of the agreement signed by defendants or some other person lawfully authorized to sell defendants' land for them.
Alternatively, plaintiffs assert that the April 30, 1990 letter from Sjoberg to Carpenter satisfied the statute of frauds. This Court finds, however, that this letter is not enough to satisfy the statute of frauds for two reasons. First, this Court is not satisfied that Sjoberg, the party who signed the agreement, had actual or apparent authority to do so. Second, the letter itself is not definite enough to prove that an agreement, as opposed to mere negotiations, had been reached.
For Sjoberg's signed letter to bind defendants to a contract that would fall within the statute of frauds, Sjoberg's authority to bind defendants must also satisfy the statute of frauds.Bourne v. Campbell, 21 R.I. 490, 44 A. 806 (1899). Since no such written agreement authorizing Sjoberg to bind defendants in a land sales contract exists, arguments that Sjoberg had actual authority to bind defendants are barred by the statute of frauds. Similarly, plaintiffs' arguments that Sjoberg had apparent authority to bind defendants also fail. It is defendants' actions that determine whether or not apparent authority exists, and defendants never took any actions which could reasonably lead plaintiffs to believe that Sjoberg could decide matters for them. Neither defendant ever told plaintiffs to go through Sjoberg or that Sjoberg would handle the matter for them. Rather, plaintiffs' first contact with Sjoberg was upon their own initiative and was for the purpose of enlisting Sjoberg's help in convincing Stedman to agree to the swap. If plaintiffs had, at that time, thought that Sjoberg was the one who would make the final binding decision as to the land swap, they would not have sought Sjoberg's help in convincing defendants but would have sought to convince Sjoberg alone to agree to the swap. Furthermore, the evidence before this Court fails to reveal any evidence of actions taken by Stedman or Carey besides their mere inaction that would lead plaintiffs to believe that the situation had changed.
While plaintiffs argue that based on Rhode Island cases Sjoberg, as defendants' attorney, has the power to bind defendants and that his actions become their actions, his reliance on cases which refer to actions of an attorney in the context of pending litigation is misplaced. Sjoberg, simply by his representation of defendants in this nonlitigation context, does not have the power to bind defendants or to force him to decide one way or the other with regard to the land swap. This is most evident by the fact that Sjoberg, upon his receipt of the proposed deeds, did not look at them personally and then request further information but rather forwarded them to Stedman and another attorney. That plaintiffs knew of these actions is established by the letter from Sjoberg to Carpenter dated March 30, 1990. That Sjoberg had no authority to bind defendants is also evidenced by the testimony of both Carpenter and Sjoberg that Sjoberg "recommended" to defendant Stedman that he sign the deeds. If Sjoberg had the power to bind Stedman, he would not have recommended that Stedman sign the deeds but would have told him to sign the deeds. Thus plaintiffs are unable to satisfy the statute of frauds, and as a result their claim for damages based on any alleged agreement to swap land must fail.
Assuming arguendo that plaintiffs were able to satisfy the statute of frauds, or remove themselves from its requirements, then their claim for breach of an oral agreement would still fail. This is because what took place between Sjoberg and Carpenter were merely negotiations. The paper trail does not illustrate any meeting of the minds or point in time in which both parties agreed to the same substantive agreement. Rather, it shows a series of offers by plaintiffs which defendants were considering and seeking further information on. Even the "smoking gun" letter, which is the most definitive statement by Sjoberg, states that before "consummation" of the deal there were some questions and issues that had to be dealt with. After sending this letter, Mr. Sjoberg even went so far as to ask if the swap was off. This statement supports Sjoberg's testimony that no agreement was ever reached.
This Court's conclusion that the parties never reached an enforceable agreement is further supported by the fact that when defendants did not sign the deeds, Carpenter threatened to sue defendants to evict them, not to sue them for breach of agreement. The letter is significantly devoid of any mention of an agreement and merely references the deeds which were shown by the evidence to be an unaccepted offer. Such a threat, of a suit based on eviction and not based on contract, is further evidence that the parties were still negotiating and were posturing themselves so as to further those negotiations.
For the above reasons this Court finds that no enforceable agreement to swap land exists between plaintiffs and defendants.
The Breach of Covenants of Title Claims
This leaves the Court with the breach of the covenants of title claims brought by plaintiffs against defendants. In the state of Rhode Island, when land is sold by warranty deed the seller makes five warranties. These include that the real estate is free from encumbrances and that the purchasers have the right to quiet enjoyment of the land. Plaintiffs allege that because defendants sold the land to Cappuccio by warranty deed, and Cappuccio sold the land to plaintiffs by warranty deed, any damages recoverable because of the location of defendants' home are recoverable against defendants as remote grantors.
The covenant against encumbrances is an "in praesenti covenant which, if broken at all, [is] broken at the time of the delivery of the deed." Lewicki v. Marszalkowski, 455 A.2d 307
(R.I. 1983). The covenant provides a purchaser with protection from the diminution of the value of property purchased, due to preexisting rights or interests of other parties. Because defendants offered no evidence contradicting Grant's expert testimony that defendants' house is on plaintiffs' land, the location of the house is not in dispute. As a result of defendants' house being on plaintiffs' land, the land is encumbered. 20 Am.Jur.2d Covenants, Conditions and Restrictions
§ 86 at 650 and David A. Thomas ed., 9 Thompson on RealProperty § 82.10 (c)(3) at 360.
The covenant against encumbrances usually does not run with the land, and therefore, it normally cannot be raised by remote grantees such as plaintiffs. Roger A. Cunningham, William B. Stoebuck Dale A. Whitman, The Law of Property § 11.13 at 866-867 (1993); David A. Thomas ed., 9 Thompson on Real Property
§ 82.10 (d) at 368; Herbert Thorndike Tiffany, 4 The Law ofReal Property § 1022 at 312; Patrick J. Rohan ed., 6A Powellon Real Property § 900[5] at 81a-150, 151. This rule, however, is not universal, and some jurisdictions have, by a statute or by case law, permitted actions based on breach of the covenant against encumbrances to be brought by remote grantees. David A. Thomas ed., 9 Thompson on Real Property § 82.10 (d) at 368 and § 82.10 (e) at 385; Herbert Thorndike Tiffany, 4The Law of Real Property § 1022 at 312; Patrick J. Rohan ed., 6A Powell on Real Property § 900[5] at 81a-151.
Rhode Island has, by statute, adopted this less prevalent view that remote grantors may be sued for breach of the covenant against encumbrances. Specifically, the language of §34-11-15 states:
 "A deed substantially following the form entitled "Warranty Deed" shall, when duly executed, have the force and effect of a deed in fee simple to the grantee and his or her heirs and assigns, to his or her and their own use, with covenants on the part of the grantor, for himself or herself and for his or her heirs, executors, and administrators, with the grantee and his or her heirs and assigns,
 ". . .
 "(2) That the granted premises are then free from all incumbrances."
Under Rhode Island law when a statute's language is unambiguous and expresses a clear and sensible meaning, there is no room for statutory construction; rather, in such cases the words should be given their plain and obvious meaning. Cardarelliv. Department of Employment and Training, 674 A.2d 398 (R.I. 1996) and In Re Advisory Opinion to the Governor, 504 A.2d 456
(R.I. 1986). Thus, given the plain and ordinary meaning of §34-11-15, remote grantees, or assigns of an original grantee, may bring an action against the original grantor for a breach of the covenant against encumbrances if the property was encumbered at the time of the original transfer. Because defendants' house was on the property that defendants sold to Cappuccio at the time of the sale, the property was encumbered and in breach of the warranty deed's covenant against encumbrances.
The nature of the covenant of quiet enjoyment is different. This covenant protects a purchaser of land from losses due to claims of superior title to the land. This warranty is a future warranty which normally runs with the land to remote grantees, and the breach of which occurs upon the "eviction" of the landowner. Herbert Thorndike Tiffany, 4 The Law of Real Property
§ 1010 at 277; Patrick J. Rohan ed., 6A Powell on RealProperty § 900[2] at 81a-144. Rhode Island General Laws (1956) § 34-11-15 follows this rule and sets out that the covenant of quiet enjoyment protects the grantee and his assignees at all times after the transfer. Therefore, plaintiffs' action against defendants as original and remote grantors may be brought by plaintiffs as remote grantees. To be successful in this claim plaintiffs must prove that they have been actually or constructively evicted from all or part of the property. Such an eviction has occurred in this case because by having part of their home on plaintiffs' land, defendants have prevented plaintiffs from the use and enjoyment of that part of their land. 20 Am.Jur.2d Covenants, Conditions and Restrictions § 98 at 661, 662.
Damages
The law is well settled that a covenant against encumbrances is one of indemnity. Thus the correct measure of damages is the recovery of a sum equal to the injury actually sustained.Zambarano v. Morvillo, 52 R.I. 438, 161 A. 106 (1932) and Herbert Thorndike Tiffany, 4 The Law of Real Property § 1022 at 312. In a situation wherein an outstanding encumbrance cannot be extinguished, recovery is ordinarily measured by the resulting diminution of value of the land. Herbert Thorndike Tiffany, 4 TheLaw of Real Property § 1018 at 303. Furthermore, under the transitional rule, damages are limited to those paid to the coventor, with damages for partial breaches being determined by taking the proportion of the breach to the whole property and applying that percentage to the sale price. Patrick J. Rohan ed., 6A Powell on Real Property § 900 [4] at 81a-148. Lost profits, which were not foreseeable by the grantor in the original transaction, are not recoverable. 20 Am.Jur.2dCovenants, Conditions and Restrictions § 156 at 716.
Similarly, damages for partial breach of a covenant for quiet enjoyment are based upon "the relative value of the part as to which title fails" and the purchaser has been evicted. 20 Am.Jur.Covenants, Conditions and Restrictions § 144 at 702.
In the instant matter, Grant testified that the actual encroachment of the house onto plaintiffs' land represents 14 square feet out of a 65,000 to 70,000 square foot lot. His estimation was that the encroachment represented about .02153% of the property area.
While plaintiffs claim that this small encroachment deprived them of all beneficial use of the property and that, therefore, they should recover their full expenditure in purchasing the property, such a claim is neither tenable nor substantiated by the evidence. The South Kingstown Planning Board had given approval to the original plat plans which showed the home to be exactly on the line, and at no time did plaintiffs submit a plan simply shifting the lot lines as opposed to swapping land. It is not the role of this Court to sua sponte decide whether or not a plan, if submitted, would or would not have been approved by a town planning board. As a result plaintiffs have failed to meet their burden of proving that the value of the encroached section of the property is, in fact, the full value of the property, or is even more valuable than its pro rata proportional value.
Accordingly, this Court finds that since defendants did partially breach the covenants against encumbrances and of quiet enjoyment, plaintiffs are entitled to some damages. Specifically, plaintiffs are entitled to .02153% of the purchase price between defendants and Cappuccio. Thus plaintiffs are entitled to two thousand one hundred and fifty-three dollars ($2153).
Counsel are hereby ordered to prepare and submit an order consistent with this decision.