DECISION
This case is before the Court on Plaintiff E.W. Burman, Inc.'s motion for a prejudgment attachment against Defendant Bradford Dyeing Association, Inc. For the reasons set forth in this Decision, this Court grants Plaintiff's motion.
 I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
This action stems from a fire that occurred in May of 2007 at Defendant Bradford Dyeing Association, Inc.'s manufacturing facility located at 460 Bradford Road in Westerly, Rhode Island. Following the fire, Bradford met with its engineer, Commonwealth Engineers Consultants, its insurance company, Liberty Mutual, and its attorneys to plan for reconstruction of the property. The request for bids states that Bradford "is seeking lump sum bids for the demolition and reconstruction work related to fire damaged portions of the building" on the property. The bid solicitation specified, "Removal and Disposal of machinery, piping, conduit, and electric wiring in fire affected area." It also included the "[removal] and [disposal] of the roof and supporting structural elements. Construction of new roof and supporting structural *Page 2 
elements." (Pl.'s Mem., Ex. A.) The request further stated that, "Contract award is anticipated to be August 24, 2007." (Burman Aff., Pl.'s Ex. A.)
Burman submitted a bid for $1,646,430.00 of which $120,000.00 represented profit. (Burman Aff. ¶ 11.) Burman's bid included "[r]emoval and disposal of machinery, piping, conduit, and electrical wiring in fire affected area" at a price of $48,126.00 and "[removal] and [disposal] of the roof and supporting structural elements. Construction of new roof and supporting structural elements" at a price of $1,598,304.00. (Pl.'s Mem., Ex. B.) Following its bid submission, Commonwealth asked Burman when it could start the project and when it would be completed. (Burman Aff. ¶ 12.) It is uncontroverted that Commonwealth emphasized to Burman that Bradford wanted to complete the repairs at the "earliest possible date" and that the project was to be completed on a "fast-track expedited basis." Id.
On August 23, 2007, Bradford accepted Burman's bid and awarded Burman the contract. Later that day, Commonwealth contacted Burman to explain the method of payment on the project. The parties arranged a meeting for August 27, 200 to finalize the details of the contract. (Burman Aff. ¶ 13.)
It is uncontroverted that, on August 27, 2007, at a meeting attended by representatives of Burman, Bradford, Commonwealth and Liberty Mutual, as well as Bradford's attorneys, Bradford verbally awarded Burman the contract. (Burman Aff. ¶ 14.) It is also uncontroverted that as of that date, Bradford and Burman had agreed that Burman would perform the work, had agreed on the scope of the work, and had agreed on the contract price of $1,646,430.00. (Burman Aff. ¶ 15.)
Burman contends that the parties then began the process of drafting a written contract to reflect their agreement. The parties used modified versions of the Form and the AIA A201 *Page 3 
General Conditions of the Contract for Construction. The parties exchanged a draft contract as of September 10, 2007 that contained the following material terms: a contract price of $1,646,430.00 with the work to include "repairs sufficient to allow owner to utilize the building as a functioning business facility." (Pl.'s Ex. C, 2.) In addition, the draft contract provided:
 (1). Substantial completion was December 31, 2007;
 (2). An incentive payment of $10,000 would be awarded to Burman if it completed the Project by December 17, 2007 (with a $2,500 daily payment for each day Burman completed the Project prior to December 17, 2007); and
 (3). Liquidated damages of $5,000 per day would be imposed for each day the Project was late.
(Pl.'s Mem., Ex. C.)
Burman argues that, around this time, Commonwealth had knowledge of and gave consent to Burman's ordering of materials. Conversely, Bradford contends that neither Bradford nor Commonwealth authorized Burman to enter into contractual relationships with subcontractors or material suppliers for the purchase of materials for the [p]roject. (Grills Aff. ¶ 10; Clarke Aff. ¶ 9.)
On September 6, 2007, Burman submitted a purchase order to Reliable Truss Components, Inc. in the amount of $825.00 that authorized it to proceed with the shop drawing process. (Burman Aff., Ex. J.) It is uncontroverted that in response to Burman's September 11, 2007 e-mail requesting information regarding orders for specialty bolts and fasteners to be used for the project, Commonwealth responded substantively to Burman's questions knowing that Burman was relying on these answers in purchasing materials. (Burman Aff., Ex. E.) It is also uncontroverted that on September 13, 2007, with the knowledge of Bradford and/or Commonwealth, Burman issued a $61,800.00 purchase order for customized steel items from Shawmut Metal Products, Inc. (Burman Aff., Ex. J.) *Page 4 
Commonwealth communicated with Burman regarding its progress. In response to a September 17, 2007 e-mail from Burman indicating the need for an on-site visit, Commonwealth gave feedback on Burman's field shop drawings, but also informed Burman, "[a]s there is no signed contract, all work done to date and until a contract is signed is at [Burman's] own risk." (Clarke Aff. ¶ 10, Ex. A.) This communication occurred after Commonwealth had authorized Burman explicitly and implicitly to go forward with the project and order materials needed to proceed with the renovation work.
Following a hiatus due to unrelated issues between Bradford and its insurance carrier, it is uncontroverted that on October 23, 2007, Commonwealth told Burman that the "project [was] okay to go." (Burman Aff. ¶¶ 23-24; Burman Dep. pp. 2000-219.) On October 24, 2007, Bradford sent what Bradford referred to as "final versions" of the A101 Contract and the A201 General Conditions to Burman. (Pl.'s Mem., Ex. G.) It is uncontroverted that these draft forms contained "a few revisions, including the deletion of the incentive and liquidated damages provisions, and pushed back the date of substantial completion until February 28, 2008 to accommodate the delays with the insurance company from early September to late October, 2008. The scope of work and contract price remained unchanged, consistent with all prior iterations of these documents." (Burman Aff. ¶ 25.) It is undisputed that the parties never signed this written contract.
Through a series of e-mails between Burman and Commonwealth, those parties scheduled an on-site visit to Bradford for October 25, 2007. (Burman Aff. ¶ 24, Pl.'s Ex. F.) It is uncontroverted that Burman visited Bradford to take field dimensions with the knowledge and consent of Bradford. (Id.; Burman Dep. pp. 200-219.) On October 30, 2007, with the *Page 5 
knowledge of Bradford and/or Commonwealth, Burman placed a $50,755.73 fastener order with Tri-State Fasteners, Inc. (Id.; Pl.'s Ex. J.)
Subsequently, on November 12, 2007, Bradford notified Burman that it had altered the roof design for the project. (Burman Aff. ¶ 29.) The work related to the disposal of the damaged roof and construction of a new roof — items that constituted the majority of Burman's bid price. Indeed, all but approximately $48,000.00 of the $1,646,430.00 total contract price to be paid to Burman was for the work Burman was to perform related to roof construction. As a result, Burman was forced to cancel and/or modify certain material orders that it had placed. (Burman Aff. ¶ 29.) Burman was unable to return some materials that it already had received. On December 19, 2007, Burman issued an invoice to Bradford for $99,987.32 — the cost of the non-returnable materials ordered for the original roof design, the labor expended to date, and Burman's contractual fee of 8%. (Burman Aff. ¶ 30, Ex. J.)
Bradford never paid this invoice and refused to go forward with the project. Burman alleges that Bradford thus breached its agreement with Burman. Burman argues that it sustained damages of $99,987.34 (the unpaid invoice), lost profits of $120,000.00, plus interest, costs and attorneys' fees. Burman argues that its damages exceed $200,000.00.
Conversely, Bradford argues that the parties never entered into a valid and enforceable contract. According to Bradford, although the parties began negotiating a written agreement, Burman never received authority or approval from Bradford or Commonwealth to enter into contractual relationships with subcontractors or material suppliers. Rather, Bradford alleges that the e-mail that it sent to Burman on September 17, 2007 specifically informed Burman that any work performed by Burman as of that date and until the parties signed a written contract would *Page 6 
be at Burman's own risk. Bradford asserts that neither it nor Commonwealth ever told Burman otherwise during the course of the parties' negotiations.
After the commencement of this action, Bradford ceased operations at its facilities. As a result, Burman filed a motion for prejudgment attachment in an effort to secure its ability to satisfy any judgment that it might receive against Bradford for breach of contract, arguing that it has proven a likelihood of success on the merits of its contract claim and a demonstrated need for security.
On April 9, 2010, this Court first heard Burman's motion to attach. At that time, this Court denied the motion without prejudice, not reaching the disputed issues between the parties as to whether, more likely than not, they had a contract and whether Burman could prove a need for security. The Court instead enjoined Bradford from selling, transferring, or encumbering its property without giving Burman notice and an opportunity to be heard on its motion to attach.
Bradford later gave notice to Burman and the Court that it expected to enter into a purchase and sale agreement by which it would sell the majority of its real estate and equipment. At this point, Burman renewed its motion to attach and filed a motion to compel the production of documents for which Bradford had invoked the attorney-client privilege. The Court held the motion to attach in abeyance, with the agreement of the parties, pending the outcome of a hearing on the motion to compel. Pending decision on the motion to compel and the motion to attach, the parties agreed that Bradford would deposit proceeds from the sale of the property into the Court Registry. Bradford subsequently deposited $250,000.00 into the Court Registry pending decision on these motions.
With regard to the motion to compel, this Court conducted anin camera review of the subject documents, reviewed the memoranda submitted by the parties and then ordered Bradford *Page 7 
to produce several additional documents. It also gave Burman time to review the additional documents and gave both parties an opportunity to supplement their memoranda with respect to Burman's motion to attach. Both parties subsequently filed supplemental memoranda. After consideration of Burman's motion for prejudgment attachment, affidavit, supplemental affidavit, exhibits, supporting memoranda of law, and Bradford's objection, affidavits, exhibits, and supporting memoranda of law, this Decision follows.
 II. ANALYSIS
A plaintiff may seek a prejudgment attachment against a defendant's property to ensure the eventual satisfaction of a judgment. See
R.I. Gen. Laws 1956 § 10-5-2 (discussing the procedure for obtaining an attachment). A writ of attachment shall be granted if the moving party demonstrates "that there is a probability of a judgment being rendered in favor of the plaintiff and that there is a need for furnishing the plaintiff security in the amount sought for satisfaction of such judgment, together with interest and costs." R.I. Super. Ct. R. Civ. P. 4(m)(3); see Martin v. LincolnBarr, Inc., 622 A.2d 464, 467 (R.I. 1993).
To address Burman's motion to attach, therefore, this Court first must determine whether Burman can establish a probability of success on the merits of its breach of contract claim. For Burman to meet this burden, it must demonstrate a likelihood of success as to the following:
 (1). that a valid contract existed between Burman and Bradford;
 (2). that Bradford breached that contract; and
 (3). that Burman suffered damages as a result of Bradford's breach.
Petrarca v. Fidelity Cas. Ins. Co.,884 A.2d 406, 410 (R.I. 2005) (citing Rendine v. Catoia,158 A. 712, 713 (R.I. 1932)); see Narragansett Elec. Co. v.Carbone, 898 A.2d 87, 99-100 (R.I. 2006) (quoting Parker v.Parker, 238 A.2d 57, 61 (R.I. 1968)). *Page 8 
If Burman establishes a likelihood of success on the merits of its contract claim, this Court then must determine whether it has established a need for security. This Court will address these issues in seriatim.
 A. Likelihood of Success on the Merits of Burman's ContractClaim
Burman argues that it is entitled to a writ of prejudgment attachment "because the record shows that [Bradford] breached its contract with Burman and it is likely that [Bradford] will not have the financial capacity to satisfy a judgment." Burman contends that the conduct and communication between Bradford, its agents, and Burman demonstrate Bradford's objective intent to be bound by an oral contract with Burman. Burman avers that Bradford accepted Burman's bid and awarded the project to Burman on August 27, 2007. According to Burman, the parties agreed at that time to all material terms of the contract. Burman further asserts that the parties' subsequent dealings and the November 5, 2007 written form of the A101 Contract and the A201 General Conditions to which they both assented indicate the objective intent of both Bradford and Burman to be bound by their verbal agreement. As a result, Burman contends that the parties entered into a valid and enforceable oral contract, despite the fact that the parties never executed a final written agreement.
In response, Bradford argues that the parties never formed a contract. According to Bradford, "[i]t is undisputed that (a) the parties were negotiating a written contract for the Project and (b) the parties never signed the written contract." Bradford asserts that "the parties spent several weeks negotiating and exchanging drafts of a written contract, but never completed those negotiations and never signed the contract." (Def.'s Mem. 1.) Bradford asserts that "[p]arties who are actively negotiating the terms of a written contract have not expressed an objective *Page 9 
intent to be bound by anything other than a completed and signed contract." (Def.'s Supp. Mem.3.) Bradford further alleges that Burman admitted in a deposition taken pursuant to R.I. Super. Ct. R. 30(b)(6) that the parties did not enter into a contract at their August 27, 2007 meeting. (Def.'s Supp. Mem. 3.) Bradford contends that Burman's breach of contract claim must fail because no contract was formed between the parties. (Def.'s Mem. 4.)
Bradford further contends that the draft agreement circulated by the parties stated that "[t]he Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreement, either written or oral." Bradford cites Ciaramella v. Reader's Digest Ass'n,131 F.3d 320, 324 (2d Cir. 1997), for the proposition that "[t]he presence of a merger clause [in a proposed written contract] is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." Bradford thus argues that the facts and circumstances of the case demonstrate that Burman is unlikely to succeed on the merits of its breach of contract claim.
1. Existence of Contract
It is well-settled in Rhode Island law that a valid and enforceable oral agreement can be formed notwithstanding the absence of a signed written contract. See Smith v. Boyd,553 A.2d 131, 133 (R.I. 1989); Desimone v. CMG,INC., et al., C.A. No. PM 01-6077, 2004 WL 422908 (R.I. Super. Feb. 9, 2004). To be enforceable, an oral agreement must be "sufficiently certain so that what was promised can be ascertained." Desimone,2004 WL 422908 at *10 (quoting Kenneth D. Lamb Co.,Inc. v. Bear Stearns Cos. Inc.,262 A.D.2d 36 (N.Y. App.Div. 1999) (citing Stein, ConstructionLaw § 3.10[1][b])).
Additionally, the parties must manifest their objective intent to be bound by the agreement. See McGrath v. Rhode IslandRet. Bd., 906 F.Supp. 749 (D.R.I. 1995). "The court *Page 10 
looks to an external interpretation of [the parties'] intent to promise or be bound." Grossman's Inc. v. Genuario,1996 WL 936909 (R.I. Super. Ct. 1996) (quoting Boyd,553 A.2d at 133). A party will be bound before signing a written contract if it signified that intent to the other party.See Boyd, 553 A.2d at 131 (quotingMississippi Dominion Steamship Co. v. Swift,86 Me. 248, 258, 29 A. 1063, 1066-67 (1894)).
The determination of whether there was an objective intent to be bound by an oral agreement must be made on a case-by-case basis.See Smith v. Boyd, 553 A.2d at 131. To determine whether Bradford and Burman objectively intended to be bound before execution of a final written agreement, this Court must consider the parties' conduct. See Desimone, C.A. No. PM 01-6077, 2004 WL 422908 at * 10 (citing Stein, ConstructionLaw § 3.10[1][a](2003)). The subjective intent of either party is largely irrelevant. Id. at *10.
In Smith v. Boyd, the Rhode Island Supreme Court of Rhode Island outlined various factors to be considered when determining whether a party's objective intent was to be bound before or upon execution of a written contract. 553 A.2d at 134. These factors include: "the practice of the trade or profession, the prior practice between the parties, whether the written contract was to be drawn up by persons other than the parties, and statements made during the negotiations." Id. In finding that there was no objective intent to enter into a binding contract prior to signing a written agreement, the Court placed great weight on a party's statement that he did not intend to be bound contractually until the written agreement was executed. Id. (holding that communication between a homeowner and prospective buyer had not progressed beyond negotiations to form a binding contract).
In Desimone, the Rhode Island Superior Court, on different facts, reached the opposite conclusion. C.A. No. PM 01-6077, 2004 WL 422908 at *10. The Court found that the parties' *Page 11 
conduct exhibited an objective manifestation of the parties' mutual assent to be bound by an oral agreement and therefore the oral agreement was enforceable. Id. The parties had performed a walk-through of the premises where the plaintiff would be performing his electrical work, the plaintiff had performed work on-site for over six months, and the defendant had partially paid the plaintiff for his work Id.
In a decision of the United States Court of Appeals for the Second Circuit, relied on by both parties in the instant case, the Court outlined several factors that are instructive in determining whether the parties manifested an objective intent to be bound before execution of a written agreement. Ciaramella, 131 F.2d at 323. These factors include: "(1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract committed to writing."Id. at 323 (citing Winston v. Mediafare EntertainmentCorp., 777 F.2d 80 (2d Cir. 1985)). The Court explained that "[n]o single factor is decisive, but each provides significant guidance." Id. (citing R.G. Group,Inc. v. Horn Hardart Co., 751 F.2d 69, 74-75 (2d Cir. 1984)). The Court in Ciaramella held that the parties manifested no objective intent to be bound before signing the written agreement. Id. It found that "[t]he presence of a merger clause [in a proposed written contract] is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." Id.
In considering this dispute in light of these precepts, this Court notes at the outset that the parties have not presented evidence as to all of the factors outlined in these cases.[1] The cases are *Page 12 
nonetheless instructive, however, on the issue of whether the parties here manifested an objective intent to be bound before execution of a written contract.
Initially, it is important to note in this case that Bradford presented the project to Burman as being on a fast-track schedule. Following the parties' August 27, 2007 meeting, Bradford not only had awarded Burman the contract, but also had determined the contract price, method of payment, and the scope of the work to be performed. While it is true that the parties did not enter into a contract at that meeting, that thereafter they began negotiating a written contract with a merger clause and, on September 17, 2007, Bradford, through its agent Commonwealth, instructed Burman that all work done before and after that date, absent a written contract, would be done at Burman's risk, Bradford's conduct was to the contrary. Before and after that date, Bradford, through its agent Commonwealth, maintained contact with Burman regarding its shop drawing and orders for materials. Indeed, Commonwealth specifically instructed Burman on October 23, 2007, that "the project was okay to go." The following day, Bradford sent to Burman the final version of the written contract. Within a week thereafter and with Bradford's knowledge, Burman visited Bradford to take field dimensions and placed a large fastener order. Thus, before Bradford notified Burman of its desire to change the roof design on November 12, 2007, Burman received the go ahead for the project; began ordering materials; hired an estimator, project manager and carpenter; finished a field shop drawing, submitted it to Bradford for approval, and received feedback on it from Bradford's engineer; completed an on-site visit; and finalized the written contract — all with the knowledge and consent of Bradford.
Although, as of this time, the parties still had not executed a final written contract, and their proposed written contract contained a merger clause, all material terms of the contract had been negotiated and agreed upon, including the price, method of payment, construction schedule, *Page 13 
and the scope of the work to be performed. It is uncontroverted that by November 5, 2007, the "mere signing of the contract" was the only task remaining. (Burman Aff. ¶ 28.) Notwithstanding the absence of a final written contract, Burman had partially performed its obligations under the oral contract with Bradford, with Bradford's knowledge and consent.
Based on Smith, Desimone, and Ciaramella, this Court thus finds that Bradford exhibited an objective intent to be bound by its oral agreement with Burman prior to the execution of a written contract. Having reached an oral agreement as to the material terms of the contract, it encouraged and accepted Burman's part performance of that contract to ensure that the renovation work could be finished as quickly as possible.[2]
In addition, the evidence suggests that the parties not only agreed upon the work to be performed and the price for the work, but that they also agreed upon the method of payment and a construction schedule, outlining a timetable in which the work was to be performed. As in DeSimone, therefore, when the defendant showed the plaintiff the work to be performed and *Page 14 
both parties agreed upon a price for the work, the evidence here suggests that the oral agreement between these parties was sufficiently definite to be enforceable. 2004 WL 422908 at 10. For all these reasons, Burman is likely to succeed on the merits of its claim that a valid and enforceable oral agreement existed between the parties prior to November 12, 2007.
2. Breach of Contract
The next issue this Court must address is whether Burman is likely to succeed on the merits of its claim that Bradford breached its oral agreement with Burman. See Petrarca,884 A.2d at 410. Burman argues that Bradford breached its contract by refusing to pay the invoice from Burman and by refusing to go forward with the project. Bradford contends that the parties never formed a contract and therefore does not make an argument that it did not breach the contract.
On November 12, 2007, Bradford notified Burman that it had altered the roof design for the project. This alteration caused Burman to cancel and/or modify certain material orders that it had placed with Bradford's knowledge and consent. Burman was unable to return some materials that it already had received and, on December 19, 2007, issued an invoice to Bradford for the cost of those materials. This $99,987.32 invoice represented the cost of the materials received, the labor expended, and Burman's contractual fee of 8%. (Burman Aff. ¶ 30.) Bradford refused to pay this invoice and refused to go forward with the project in November and December 2007. As a result, it is likely that Burman will succeed in establishing that Bradford breached its agreement with Burman for reconstruction of Bradford's fire damaged property.
3. Damages
Finally, in addition to proving the existence of a contract and breach, to succeed on its claim for breach of contract, Burman must prove damages. See Petrarca, 884 A.2d at 410. *Page 15 
Burman argues that it has suffered damages in excess of $200,000.00 (an unpaid invoice of $99,987.34, lost profits of $120,000.00, plus interest, costs and attorney's fees). Bradford does not challenge these claimed amounts.
With the knowledge and consent of Bradford and Commonwealth, in early September 2007, and in late October 2007, Burman began part performance of the contract, including ordering materials pursuant to the parties' construction schedule. Burman's December 19, 2007 invoice indicates that, up until November 12, 2007, when Bradford notified Burman of its desire to change the roof redesign, Burman had spent $99,987.34. This figure represents Burman's labor costs, including payment for its estimator and project managers ($1,762.00), its carpenter foreman ($1,593.87), as well as its cost for materials that it had ordered that it was unable to return ($89,225.00) and its 8% contractual fee ($7,406.47). (Pl.'s Mem., Ex. J.) Because Burman ordered these materials according to the parties' mutually agreed upon construction schedule and with the knowledge and consent of Bradford and Commonwealth, and could not return them, this Court is satisfied that Burman has proven a likelihood of being awarded damages for the materials and its related labor costs and contractual fee in the amount of $99,987.34.
In addition to its out-of-pocket costs, Burman also argues that due to Bradford's breach of contract, Burman lost its contractual fee of $120,000.00 on the entire contract and should be awarded accrued statutory interest and attorney's fees related to Bradford's breach. As this Court has found that Burman has established a likelihood of success on its claim for breach of its contract with Bradford, it necessarily follows that it has proven a likelihood of success on its claim for damages for its lost contractual fee or lost profits on the entire contract of $120,000.00, plus interest. *Page 16 
Accordingly, Burman has proven a likelihood of success as to its claim for breach of contract, namely, that a valid and enforceable oral contract existed between it and Bradford, that Bradford breached that contract by refusing to go forward with the project and pay the materials invoice and that Burman suffered damages in excess of $200,000.00, plus statutory interest, as a result of Bradford's breach. The final question, therefore, is whether Burman has proven that it is inadequately secured with respect to its claim for breach of contract.
 B. Need for Furnishing Burman Security
Burman argues that it is in need of security because, in the aftermath of this contract dispute, Bradford transferred its most valuable assets. It is uncontroverted that after Burman filed its motion to attach and after this Court initially heard and denied that motion (without prejudice to its renewal should there be such a transfer of assets), Bradford transferred its textile manufacturing business and the property where it operated to a successor company and ceased operating its manufacturing business. (Pl.'s Supp. Mem. 1.) Bradford also deposited $250,000.00 into the Court Registry, pending decision on Burman's motion to attach. Burman now reasserts its need for security and seeks a prejudgment attachment against the funds that Bradford deposited. Id.
As to Burman's claim of inadequate security, Bradford argued at this Court's first hearing on Burman's motion for prejudgment attachment that, despite selling the property, equipment, and other tangible assets associated with the property, it still maintained an interest in two separate parcels of land located adjacent to the property that could provide Burman adequate security. Bradford asserted at the hearing that these two parcels were worth $67,000.00 and $147,000.00, respectively. Moreover, Bradford agreed not to sell or encumber these properties *Page 17 
without giving Burman notice and an opportunity to be heard further regarding its need for security. In its response to Burman's supplemental memorandum, Bradford submitted more information regarding the value of these two properties which are located at 3 North Main Street and 5 North Main Street in Westerly, Rhode Island. The assessed values of these properties, according to Bradford, are $67,800.00 and $86,000.00, respectively. The assessed value of the more valuable property is thus substantially less than what Bradford had represented its value to be at the initial hearing.
Additionally, Bradford asserts that it is an operating entity with a fabric inventory valued at approximately $1,000,000.00. Bradford contends that it sold $100,000.00 worth of fabric last month. (Def.'s Supp. Mem. 2.) Bradford further asserts that "[w]hen and if [Bradford] decides to dissolve, its creditors are protected by the procedures for dissolution set forth in the Rhode Island Business Corporation Act." Id.
"Attachment for security reasons is appropriate when it appears likely that the plaintiff will have difficulty enforcing the judgment." Normandin v. Gauthier,2006 WL 1073422 (R.I. Super. April 20, 2006) (citingAtlantic P.B.S., Inc. v. Long,1994 WL 931005 (R.I. Super. Dec. 5, 1994) (citing Katz Agency,Inc. v. Evening News Ass'n,514 F.Supp. 423, 429 (D.C.N.Y. 1981)). In Atlantic P.B.S.,Inc. v. Long, the Court found that plaintiff had demonstrated a need for security because defendant had refused to pay plaintiff an obligation that it had owed for more than eight years, defendant had terminated and liquidated its business that was the source of payment and employment to plaintiff, and two creditors had obtained judgments against defendant. 1994 WL 931005 (R.I. Super. 2005).
Similar to Long, it is undisputed here that Bradford has sold the property that was the subject of the contract at issue in this litigation. Further, it is uncontested that Bradford has *Page 18 
ceased operations at its manufacturing facility and is currently selling off its $1,000,000.00 fabric inventory. There is no evidence that Bradford continues to manufacture or has plans to resume manufacturing operations in the future. Bradford is a current creditor of its successor company and maintains ownership of two unencumbered parcels of land with a combined assessed value of $153,800.00; however, the fair market value of these properties and the ease with which they could be liquidated to satisfy any judgment against Bradford are unknown.
The fact that Bradford's property at issue in this litigation has been sold, its manufacturing business has ceased operations, and its assets are currently being sold, demonstrates that Burman lacks security with respect to its claim against Bradford for breach of contract. This Court is not satisfied that the unrelated properties owned by Bradford provide sufficient security should a judgment ultimately be rendered in Burman's favor. The absence of proof of adequate security thus militates in favor of granting Burman its requested attachment.
 CONCLUSION
Accordingly, this Court grants Burman's motion to attach in the amount of $250,000.00 as security for damages, plus statutory interest, that Burman has proven, more likely than not, that it sustained as a proximate result of Bradford's breach of contract. To effectuate the attachment, this Court orders that the $250,000.00 that Bradford deposited into the Court Registry must remain on deposit pending the resolution of this litigation or further order of this Court.
Counsel shall confer and submit to this Court forthwith for entry an agreed upon form of order that is consistent with this Decision.
[1] In particular, the parties have provided this Court with no evidence of the practice of the trade or profession or the prior practice of these parties in negotiating and entering into construction contracts — factors relevant to the courts inSmith v. Boyd and Ciaramella in determining whether the parties manifested an objective intent to be bound before execution of a written contract.
[2] While it is true that the Court in Ciaramella relied, in part, on the presence of a merger clause in the parties' draft written agreement in finding that they did not intend to be bound prior to signing the agreement, the Court also found it significant that there was no evidence of partial performance and that the parties had not yet agreed on all material terms of the contract. 131 F.2d at 324. Here, in contrast, notwithstanding the continued negotiation between Burman and Bradford of a final written agreement with a merger clause, Burman engaged in part performance of the contract and agreed with Bradford on all material terms of the contract (including the price, scope of work, and payment schedule), as reflected in the final unsigned version of their agreement. Bradford also had instructed, through its agent, Commonwealth, that "the project was okay to go."Ciaramella, therefore, is distinguishable in key respects from the case at bar.
In addition, Burman's part performance, clear agreement with Bradford on all material terms of the contract (which was on the verge of execution), and Bradford's giving the green light, through Commonwealth, for the project — all occurring well after Commonwealth's e-mail warning that all work done by Burman prior to executing a written contract would be at Burman's risk and with no subsequent reiteration of that warning — further distinguish the instant case fromCiaramella (where there were multiple express reservations by a party not intending to be bound absent a written agreement) and Smith v. Boyd (where the Court relied on such an express reservation in the absence of partial performance and together with evidence of ongoing negotiations to find that the parties never progressed beyond negotiations to an agreement). This case, therefore, is more like DeSimone where evidence of part performance led the Court to enforce an oral agreement. Bradford should not be able to hide behind the absence of a written contract with a merger clause and an old e-mail to try to thwart enforcement of an oral agreement with Burman that Burman acted upon, prior to execution of a written agreement, as an accommodation to Bradford to meet its fast track project demands — especially where it appears that Bradford decided belatedly to abandon the project under the guise of a request for a new roof design. *Page 1