[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This case is before the Court on a timely appeal by the Coventry Fire District ("District") from the October 14, 2004 decision of the Rhode Island State Labor Relations Board ("Board"). That decision dismissed the District's charge alleging that Local 3240, International Association of Firefighters ("Union") committed an unfair labor practice ("ULP") when it refused to sign a collective bargaining agreement that the District claims the Union had agreed to enter. Jurisdiction is pursuant to G.L. 1956 § 42-35-15. For the reasons set forth below, the Court upholds the Board's decision.
 Facts and Travel
A review of the record reveals the following facts. The controversy currently before the Court began in June 2002. At that time, the Union and the District entered into an agreement under which the District agreed to recognize the Union as the exclusive bargaining agent for its paid professional full-time active firefighters and dispatchers, up to and including the rank of captain.[1] Subsequent to that agreement, on July 11, 2002, the Union and the District initiated collective bargaining. Andrew Baynes acted as the Union's collective bargaining representative (Tr. 12/11/03 at 27-28), although Robert Carlow ("Carlow"), President of the Union, also attended every bargaining session. (Tr. 10/28/03 at 16.) The District, in turn, designated Daniel Kinder ("Kinder") as its collective bargaining representative (Tr. 10/28/03 at 16.), but District Chief Stanley J. Mruk (Chief Mruk") had ultimate decision-making authority. (Tr. 10/28/03 at 70-71.)
At the July 11, 2002 bargaining session, the parties were unable to reach an agreement and thereafter met seven more times before the December 9, 2002 meeting, which is the center of the present controversy. Those in attendance at the December 9th meeting included Baynes, Carlow, Kinder, and Chief Mruk. On December 9th, the parties worked throughout the day and most of the night in an attempt to reach an agreement in the hope that it could be ratified at the annual fire district taxpayers' meeting, scheduled to be held the following day, December 10th. However, despite those efforts, the parties dispute whether a binding agreement was actually reached.
During the early stages of the December 9th collective bargaining meeting, the Union and the District remained at a stalemate on several unresolved issues, in particular the firefighters' salaries and hours of work. According to his testimony, Kinder refused to give the firefighters a higher hourly rate, at which point those present on behalf of the Union, with the exception of Baynes, left the room and declared the negotiations to be over. (Tr. 10/28/03 at 20-21.) To rectify the stormy situation that had arisen, Chief Mruk, as ultimate decision maker for the District, elected to concede to the Union on that issue and said he would recommend the Union's proposal to the taxpayers. (Tr. 10/28/03 at 21.) As a result of this concession, the parties resumed the meeting and continued to negotiate late into the night on the remaining unresolved issues.
According to the District, the parties eventually reached a final agreement. At the hearing before the Board, Kinder testified, "We congratulated each other on reaching it. We shook hands. I said `We have a deal.' Andy [Baynes] said `We have a deal.'" (Tr. 10/28/03 at 22.) Kinder further claimed that there was not a single unresolved issue. (Tr. 10/28/03 at 30.) Thereafter, Kinder testified that he was asked to draft a Tentative Agreement.[2] (Tr. 10/28/03 at 22.) The Tentative Agreement combined a revised proposal that the District had submitted at an earlier meeting on November 13, 2002, with five handwritten pages that were added at the December 9th meeting. At the December 9th meeting, Chief Mruk, Carlow, and Union Secretary Richard Gamelin initialed each of the five handwritten pages. After the meeting concluded, all three retained a copy of the Tentative Agreement.
Although he had initialed each page of the Tentative Agreement, Union President Carlow testified before the Board that he did not believe that he was entering into a binding agreement at that point; on the contrary, he believed he needed to bring the proposal back to the Union for ratification. (Tr. 12/11/03 at 19.) Carlow testified that he told everyone in the room, including the District's representative, Kinder, that he would have to review the agreement with his men. (Tr. 12/11/03 at 13.) Carlow further testified that he did not believe the agreement was complete or final and stated that "at the end of the day I did say there were several issues not covered under the contract." (Tr. 12/11/03 at 14.) Kinder, on the other hand, denied that he was ever told that Carlow would need to have the Union members ratify the Tentative Agreement. Kinder believed that all that was remaining to finalize the agreement was ratification by the taxpayers. (Tr. 10/28/03 at 30.)
The following evening, at the taxpayers' annual meeting, the District presented the Tentative Agreement to the voters, who ratified the proposal. Thereafter, Kinder put the December 9th Tentative Agreement into final form and mailed a copy to Baynes on December 30, 2002. On January 14, 2003, Baynes delivered a letter to Kinder stating that, upon reviewing his notes and drafts, he had discovered several differences between what he believed had been discussed at the December 9th meeting and what was actually placed in Kinder's final copy of the Tentative Agreement.
One week later, on January 22, 2003, Kinder responded to Baynes in a letter which stated that while he would be willing to amend the typographical errors in the Tentative Agreement that he had prepared, he would not make any substantive changes. Kinder notified Baynes that he was sending the Tentative Agreement to Chief Mruk to execute on behalf of the District. He further requested Baynes to obtain the appropriate signatures to execute the document on behalf of the Union. Within a few days of this letter, Chief Mruk signed the document; however, Baynes refused to do so.
In a letter from Baynes to Kinder, dated March 20, 2003, Baynes maintained that there had been no binding agreement on December 9th, because Union ratification had been a necessary prerequisite. Baynes stated that the Union had been unable to ratify the Tentative Agreement and suggested instead that the parties return to collective bargaining. In the meantime, while Baynes and Kinder continued corresponding, Carlow testified that throughout March, April, and May of 2003, the Union members, including Carlow, continued to have negotiations with Chief Mruk at the firehouse. (Tr. 12/11/03 at 39.) Carlow testified that during this period, negotiations over the agreement were ongoing and that the Union and Chief Mruk submitted various proposals to one another. (Tr. 12/11/03 at 37.)
In May 2003, the Union filed for interest arbitration with the Arbitration Association of America ("AAA"). The District responded on June 3, 2003 by filing an unfair labor practice charge with the Board. The District alleged that the Union violated its duty to bargain in good faith, pursuant to G.L. 1956 § 28-7-13.1(2), when it refused to sign the final version of the Tentative Agreement that, the District maintained, the Union had agreed to sign.[3] Furthermore, on June 10, 2003, the District filed a complaint in the Superior Court seeking to stay the AAA's interest arbitration. Ten days later, the Superior Court granted the stay.
On June 12, 2003, the Board issued its complaint to the Union. However, on September 5, 2005, before the Board had conducted any hearings on the ULP charge, and after the previous stay of interest arbitration had been vacated, the Superior Court denied the District's motion to stay. The AAA then recommenced the Union's demand for interest arbitration, scheduling proceedings for March 2004.
In the interim, the Board held formal hearings on the District's ULP charge on October 28 and December 11, 2003.[4] On October 14, 2004, the Board voted on the issue of whether to dismiss or uphold the District's ULP charge. The vote resulted in a three-three split decision and, as a result, the Board concluded that because there was neither a majority to uphold or dismiss the complaint, the matter would be dismissed on procedural grounds. The District filed a timely appeal to this Court seeking an order to reverse and remand the decision of the Board with directions to the Board to order the Union to sign the Tentative Agreement.
 Issues on Appeal
On appeal, the District alleges that the Board's decision should be reversed because it is (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the Board; (c) made upon unlawful procedure; (d) affected by other error of law (alleging that the decision was clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record); and/or (e) arbitrary, capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion. In particular, the District claims that based on the evidence in the record, as a matter of law, the Board was obligated to uphold the ULP charge and declare that the parties had a binding agreement. Further, the District contends that the Board was the only proper tribunal to resolve this matter.
In response, the Union and the Board allege that based on the Fire Fighters' Arbitration Act and the doctrine of election of remedies, the Board was prevented from resolving the issue of whether a binding contract was reached on December 9, 2002.[5] The Appellees also assert that the Board committed no error of law when it dismissed the complaint on procedural grounds when neither the motion to uphold nor to dismiss the ULP charge could sustain a majority vote. Furthermore, the Union has raised the affirmative defense of collateral estoppel by alleging that the Superior Court has already ruled that a contract did not exist. Thus, it asserts that the Board did not have jurisdiction to address that issue.
 Standard of Review
The Superior Court's judicial review of a contested Board decision is governed by the Administrative Procedures Act, § 42-35-15(g), which provides as follows:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
Under the terms of this statute, the reviewing Court is precluded from substituting its judgment on questions of fact for that of the agency.Lemoine v. Dep't of Public Health, 113 R.I. 285, 291, 320 A.2d 611, 614-15
(1974). This is true even in those cases where the Court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the Board. Berberian v. Dep't of Employment Sec.,414 A.2d 480, 482 (R.I. 1980). On appeal, judicial review by the Court is limited to an examination and consideration of the record to determine whether there is any legally competent evidence therein to support the Board's decision. Barrington Sch. Comm. v. R.I. State Labor RelationsBd., 608 A.2d 1126, 1138 (R.I. 1992). If there is any such evidence, the Court is required to uphold the agency's factual determinations. BlueCross and Blue Shield v. Caldarone, 520 A.2d 969, 972 (R.I. 1987). However, the Court is not bound by the findings or conclusions made by the agency if they are totally devoid of competent evidentiary support in the record or by the reasonable inferences that can be drawn therefrom.Milardo v. Coastal Resources Mgmt. Council, 434 A.2d 266, 270 (R.I. 1981). Furthermore, unlike questions of fact, agency decisions on questions of law are not binding upon the Court and may be reviewed to determine the law and its applicability to the facts. Narragansett WireCo. v. Norberg, 118 R.I. 596, 607, 376 A.2d 1, 6 (1977).
 Analysis Jurisdiction of the Labor Relations Board
A threshold issue is whether the Board had jurisdiction to determine whether the Union had committed an ULP. The District contends that based on the decision in Warwick School Committee v. Warwick Teacher's UnionLocal 915, 613 A.2d 1273 (R.I. 1992), the Board was the proper tribunal to render a decision on whether there had been an ULP. Conversely, the Appellees maintain that the Board was prevented from resolving that question due to either the Firefighters' Arbitration Act or the election of remedies doctrine.
In Warwick School Committee, collective bargaining negotiations took place between the school committee and the union, during which the parties apparently reached an agreement. Id. at 1274. However, the committee later alleged that its negotiators did not have the authority to consent to certain aspects of the agreement. Id. Thereafter, the union filed an ULP claim with the State Labor Relations Board alleging that the committee had violated G.L. 1956 § 28-9.3-4 and § 28-7-13 by refusing to bargain in good faith. The Board sustained the charge and ordered the committee to enter into the agreement under the terms that had been negotiated. On appeal, the Superior Court reversed the Board, holding that the committee's negotiators lacked authority to enter the agreement. On further appeal, the Supreme Court held that "if a dispute should arise between the parties concerning the effect of the failure to enter into a new agreement . . . the tribunal to make such a determination is the State Labor Relations Board . . . as specifically required by G.L. § 28-9.3-4." Warwick Sch. Comm., 613 A.2d at 1276. Further, our Supreme Court declared: "In short, the Superior Court does not have original jurisdiction of the question to determine what, if any, agreement is in force between the committee and the union." (Emphasis added.) Id.
The matter before this Court is very much akin to that in WarwickSchool Committee. Similar to that case, the Union and District here dispute whether prior negotiations resulted in a binding agreement. InWarwick School Committee, our Supreme Court held that the State Labor Board was the proper tribunal to decide whether an ULP had occurred.613 A.2d at 1276. The result should be the same here because, once again, the question for the Board to determine was whether or not the Union had committed an ULP. The fact that this decision may have hinged on the determination of whether a contract existed does not change the result. In Warwick School Committee, there was a disagreement as to the existence of a binding agreement, yet the Court still held that the Board was the proper authority to decide if there was an ULP. Id.
Consequently, the Board's determining whether or not the Union's activities constituted an ULP was not in excess of its statutory authority.
A. Firefighters' Arbitration Act
The Appellees further contend that the Board lost its jurisdiction pursuant to G.L. 1956 § 28-9.1-7. That section of the Firefighters' Arbitration Act provides: "In the event that the bargaining agent and the corporate authorities are unable, within thirty (30) days from and including the date of their first meeting, to reach an agreement on a contract, any and all unresolved issues shall be submitted to arbitration." Section 28-9.1-7. "Unresolved issues" are defined as
 "any and all contractual provisions which have not been agreed upon by the bargaining agent and the corporate authorities within the thirty (30) day period referred to in § 28-9.1-7. Any contractual provision not presented by either the bargaining agent or the corporate authority within the thirty (30) day period shall not be submitted to arbitration as an unresolved issue. . . ." Section 28-9.13-(3).
The Appellees argue that § 28-9.1-7 provides the exclusive mechanism for contract disputes involving firefighters. They allege that because the Union had already applied for arbitration when the District filed its charge, the Board was without jurisdiction to decide whether a contract existed. They further claim that the Board specifically did not render a decision on the merits as to whether a binding agreement had been formed. The District claims that the Board did decide on the issue of whether there was a contract, had full authority to do so, but was erroneous in its decision.
The true task before the Board, though, was not to determine or resolve individual contractual provisions and issues, but to determine if the Union had committed an ULP by failing to bargain in good faith. Section28-9.1-7 does not govern that duty. Pursuant to § 28-9.1-7, those issues that require submission to arbitration are "any and all unresolved issues." According to § 28-9.1-3(3), the unresolved issues that require arbitration under § 28-9.1-7 are those that relate to contract provisions that have not been agreed upon. Here, however, the Board was not resolving contract provisions on which the parties could not agree. Instead, the Board was determining whether the Union had violated §28-7-13.1(2) for failing to bargain in good faith. The determination of an ULP is not an "unresolved issue" as defined by § 28-9.13-(3); thus, it is not a question that requires presentment to arbitration. Consequently, the Board was not deprived of its jurisdiction by operation of § 28-9.1-7 and therefore did not act in excess of its statutory authority.
B. The Election of Remedies Doctrine
Also at issue is whether, notwithstanding the jurisdiction conferred upon it by Chapter 7, title 28, the Board nevertheless lost that jurisdiction pursuant to the election of remedies doctrine. The Appellees argue that once the Union filed for arbitration on the collective bargaining dispute, the District was barred from bringing an ULP charge against the Union before the Board. In support of that contention, they principally rely upon Department of Environmental Management v. StateLabor Relations Board, 799 A.2d 274 (R.I. 2002) and Lime Rock FireDistrict v. State Labor Relations Board, 673 A.2d 51 (R.I. 1996).
The Department of Environmental Management ("DEM") case involved a union that had initially elected to have its grievance resolved under a collective bargaining agreement ("CBA") that required arbitration of such matters. Rather than actually proceeding to arbitration, however, the union instead filed a complaint with the Labor Relations Board. The Supreme Court held that the election of remedies doctrine prevents one from seeking relief elsewhere when it has already elected one course of remedy seeking essentially the same relief. Department of EnvironmentalManagement, 799 A.2d at 278. Therefore, once the union elected to pursue relief under the CBA, it was prohibited from abandoning that course of remedy and instead attempting to seek relief from the Labor Board. Id. at 278-79.
Appellees argue that application of the DEM case to this matter requires the Court to conclude that once the Union sought arbitration of the contract dispute, the District was barred from bringing an ULP claim with the Labor Board. However, the DEM case is readily distinguishable. Unlike the parties in the DEM case, the District and the Union had no collective bargaining agreement. Thus, when it applied for arbitration, the Union was not electing a remedy made available to it through a CBA — there was no CBA. More importantly, the election of remedies doctrine does not apply to the District because the purpose of the election of remedies doctrine is to prevent the same individual or entity from selecting one course of remedy and then attempting to obtain essentially the same relief through another process. Id. at 278-79 (citing Cipollav. Rhode Island College, Bd. of Governors for Higher Education,742 A.2d 277, 281 (R.I. 1999)). In the DEM case, the doctrine applied because the same entity (the union) first sought relief through one course of remedy (arbitration under the CBA) and then later sought identical relief from the Board. In the case at bar, one entity (the Union) sought relief through arbitration, while the other entity (the District) only brought its grievance against the Union's alleged ULP before the Board.
The Appellees' additional reliance on Lime Rock Fire District to support its contention that the election of remedies doctrine prevents the Board from having jurisdiction over the ULP charge is also misplaced. In Lime Rock, the Supreme Court held that where a union was attempting to resolve unsettled contract issues, it was required to go through arbitration and not the Labor Relations Board. Lime Rock is clearly distinguishable from the present case. Here, the District was not asking the Board to resolve unsettled contract issues; rather, it was requesting the Board to determine whether the Union had committed an ULP — an issue over which it had jurisdiction as previously discussed. Consequently, the election of remedies doctrine did not prevent the Board from hearing the District's ULP charge, and the Board did not act in excess of its statutory authority.
C. Collateral Estoppel
The Union further contends that the Board was collaterally estopped from resolving the issue as to whether a binding agreement was formed at the December 9, 2002 bargaining session. According to the Union, the order issued on September 5, 2003 by Justice Pfeiffer denying the District's Motion to Stay Arbitration, was a ruling that no binding agreement existed, and thus, the matter could proceed to arbitration.
The order to dismiss the District's Motion to Stay Arbitration did not constitute a decision on the merits. The Court there did not reach a conclusion as to the existence of a contract. In his letter to Baynes on September 9, 2003, James Kelleher (attorney for the Union), even wrote: "The Court was not specifically asked to rule on the merits." Because the order dismissing the Motion to Stay Arbitration was not a ruling on the existence of a binding agreement or the ULP charge, collateral estoppel did not apply to prevent the Board from addressing those issues. Accordingly, the Board's actions did not constitute unlawful procedure.
 The Board's Decision
The District contends that the decision of the Board was erroneous as a matter of law. The District relies upon Sakonnett Rogers, Inc. v. CoastalResources Mgmt. Council, 536 A.2d 893 (R.I. 1988), for its proposition that failure to incorporate an operative fact into an agency's formal findings is arbitrary, capricious, an abuse of discretion and thus, reversible by this Court. The District contends that the Board's findings of fact clearly demonstrate that the Board erred when it refused to hold that the Union committed an ULP.[6] In the alternative, the District argues that if there were facts on which the Board relied in reaching its conclusion that were not placed in its findings of fact, this also is a reversible error under § 42-35-15(g).
The District's reliance on Sakonnett Rogers, Inc., for its requirement of findings of fact to support the agency decision, however, is misplaced. This Court is mindful of the long tradition of cases in Rhode Island holding that an administrative agency must disclose the basic findings upon which its ultimate findings are premised. See, e.g., id. at 893; East Greenwich Yacht Club v. Coastal Resources Mgmt. Council,118 R.I. 559, 376 A.2d 682 (1977); Hooper v. Goldstein, 104 R.I. 32,241 A.2d 809 (1968). The rationale behind this requirement is that "the absence of required findings makes judicial review impossible." SakonnettRogers, Inc., 536 A.2d at 896 (citing East Greenwich Yacht Club,118 R.I. at 569, 376 A.2d at 687). "What is required . . . is `the making of findings of fact and the application of legal principles in such a manner that a judicial body might review a decision with a reasonable understanding of the manner in which evidentiary conflicts have been resolved and the provisions of the . . . [appropriate law] applied.'"Cullen v. Town Council of Lincoln, 850 A.2d 900, 904 (R.I. 2004) (citingThorpe v. Zoning Bd. of Review of North Kingston, 492 A.2d 1236, 1237
(R.I. 1985)). Findings of fact are necessary for the reviewing court to determine in which manner evidentiary conflicts were resolved and if the Board rendered its decision on such evidentiary conflicts properly.Cullen, 850 A.2d at 904.
However, the Court has not been made aware of any cases from this jurisdiction in which this requirement was made applicable to decisions where the agency dismissed the charge because of a tied vote.[7]
Consequently, this Court will look to analogous decisions involving the effect tie votes have had on appellate review of other agency decisions from both this and neighboring jurisdictions. See, e.g., Richard v.Zoning Bd. of Review, 47 R.I. 102, 130 A. 802 (1925) (tie vote of Zoning Board was insufficient to sustain petitioner's appeal); Zagoreos v.Conklin, 109 A.D.2d 281 (N.Y.App.Div. 1985) (no formal statement of reasons for rejecting permit was necessary when Board reached its decision on a tie vote); Washington Department of Ecology v. City ofKirkland; 523 P.2d 1181 (Wash. 1974) (on appeal, the court may review an agency's tie vote decision to determine if it was arbitrary, capricious, or clearly erroneous).
The most persuasive rationale is that of the Court of Appeals of New York in Tall Trees Construction Corp. v. Zoning Bd. of Appeals of theTown of Huntington, 761 N.E.2d 565 (N.Y. 2001). In that decision, the Huntington Zoning Board of Appeals had twice reached a tie vote (two-two) when deciding on the petitioner's application for a variance.[8] Id. at 567. The Zoning Board did not make any findings of fact in its decision; rather it simply denied the variance on the ground that due to the tie vote, petitioner had not received enough votes for his application to pass. On appeal, the New York Appellate Court found that where the matter was being denied as a result of failure to pass due to a tie vote, the Board was not required to make any findings of fact. Id. at 570. Such findings were not necessary because when a matter is denied or dismissed on procedural grounds, the facts do not influence the ultimate decision.[9]
The Court believes that the same reasoning should apply to this case with respect to the findings of fact issue. In both instances the petitioners' relief was denied on procedural grounds — insufficient votes for the matter to pass. As in Tall Trees Construction Corp., the Board here also did not reach a finding on the merits. The Board concluded, "Since neither a motion to uphold a charge of unfair labor practice nor a motion to dismiss the complaint for cause has carried, the within matter must be dismissed on procedural grounds." RI State Labor Relations Bd.v. Int'l Ass'n of Firefighters, Local 3240, CA No: ULP-5673 (RI St. Labor Relations Bd. Oct. 14, 2004). Because a decision was not rendered on the merits, there was no need for the Board to have made any findings of fact. The fact that the Board did make limited factual findings is of no consequence, as those findings were not relied upon and did not form the basis of the Board's final decision — dismissal on procedural grounds.
Finding that tie vote decisions do not, and should not, include specific findings of fact, this Court notes the effects of a tie vote decision of an administrative board and how the Court should review such decisions. In Richard v. Zoning Bd. of Review, 47 R.I. 102, 130 A. 802
(1925), the Rhode Island Supreme Court held that when there is a tie vote amongst the members of the Zoning Board of Review, there are insufficient votes to sustain the appeal; as such the appeal is denied. Thus, a tie vote results in a denial of the relief sought. Id. at 104. Accordingly, here, when the Board reached a tie in deciding on the District's claim for relief, it was proper to treat such tie as a denial of that relief. However, Richard lacks any guidance on how an appellate court should review an agency decision that is based on a split decision where there have not been substantial (or even any) findings of fact on the merits. In Tall Trees Construction Corp., though, the court held that because the Board did not have to make any findings of fact, the court's appellate review was not limited to such findings when deciding whether the procedural dismissal was arbitrary or capricious. Tall Trees ConstructionCorp., 761 N.E.2d at 570. The Court articulated:
 "Courts have recognized that under the circumstances where, as here, an application is rejected by a tie vote, `there exists and can exist no formal statement of reasons for the rejection' and, thus, an examination of the entire record, including the transcript of the meeting at which the vote was taken along with affidavits . . . can `provide a sufficient basis for determining whether the denial was arbitrary or capricious.'" Id. (citing Matter of Zagoreos v. Conklin, 109 A.D.2d 281, 296 (N.Y.App. Div. 1985)).
The District contends that the reviewing court has the authority to render a decision on the merits of the case, even though the agency below did not reach a conclusion on the merits. In support of this position, the District relies on both Tall Trees Corp. andWashington Department of Ecology v. City of Kirkland,523 P.2d 1181 (Wash. 1974). In Tall Trees Corp., after a tied vote of the Zoning Board of Appeals, the court did indeed review the facts in the record and found that there was absolutely nothing in the record to support the Board's denial of the variance. 761 N.E.2d at 570. The court held that because the Board had granted variances on nearly identical facts in the past and because there was no evidence in the record to support the denial, the decision of the Board was clearly arbitrary; thus, the court reversed. Id. at 571. InWashington Department of Ecology, the court held that when reviewing a board decision that had no majority findings of fact, the court would review the decision based on the findings of fact made by those members who voted for the conclusion that had the ultimate effect.523 P.2d at 1184-85. Thus, on review the court would look to the findings of fact made by those members who voted to uphold the permit, the result of the tied vote. Id. Here, the District asserts that those decisions demonstrate that even when there is a tie vote, the appellate court still has the jurisdiction to review the Board's decision.
This Court agrees that it should have the ability to review tie decisions of an administrative agency, but that review should be limited. Only in cases such asTall Trees Corp., where there is clearly no support in the record for the agency's decision, is it appropriate for the Court to reverse the agency decision. Otherwise, the agency must be given deference.
Applying such a standard of review, the Court now addresses the District's allegation that based on all the evidence in the record, as a matter of law this Court must hold that a contract existed at the December 9, 2002 meeting and therefore, as a matter of law, the Board erred when it failed to hold that the Union had committed an ULP. It has long been held that "To form a valid contract, each party to the contract must have the intent to promise or be bound." Smith v. Boyd, 553 A.2d 131,133 (R.I. 1989) (citing J. Koury Steel Erectors, Inc.v. San-Vel Concrete Corp., 120 R.I. 360, 365, 387 A.2d 694,697 (1978)). Generally, this intent to bind oneself arises in the form of an offer or acceptance: "in order for an offer or acceptance to occur, the party must manifest an objective intent to promise or be bound."Smith, 553 A.2d at 133. However, courts will generally hold that a binding agreement does not arise when one party knows that the other party did not intend for his agreement to have any binding effect or legal consequences. Id. (citing E. Allan Farnsworth,Contracts § 3.7 at 116-17 (1982)).
During the hearing that was held on October 28, 2003, the Board heard numerous accounts from Kinder regarding his belief that the parties intended to form a binding agreement on December 9, 2002. In support of his contention that a binding agreement was formed, Kinder testified that "We congratulated each other on reaching it [the contract]. We shook hands. I said, `We have a deal.' Andy [Baynes] said, `We have a deal.' And then I was asked to make out the tentative agreements . . . which . . . you only do if you've reached an agreement." (Tr. 10/28/03 at 22.) Kinder stated that he would not have written up the Tentative Agreement if there had been any doubt that an agreement had been reached. The only issue that he believed remained open was whether the taxpayers would ratify the agreement. (Tr. 10/28/03 at 27.) Furthermore, Kinder testified to the Board that: "The ground rules [of the negotiation] called for ratification on management's side. They did not call for ratification of the Union's side." (Tr. 10/28/03 at 29.) Thus, he believed that ratification was not needed by the Union and that if ratification was not necessary, according to Kinder, a binding agreement must have been produced on December 9th.
While Kinder certainly testified as to his understanding that a contract was formed on December 9th, a review of the record reveals that there was testimony to the contrary put forth by Carlow. Throughout his testimony to the Board at the December 11, 2003 hearing, Carlow repeatedly asserted that he did not believe that he was entering into a binding agreement on December 9, 2002. When questioned about his understanding of the Tentative Agreement that he had initialed, Carlow responded: "That I would have to bring them back to my membership and research the articles I signed." (Tr.12/11/03 at 12.) Further, Carlow testified that "I remember saying that at the end of the day I would have to review it [the Tentative Agreement] with the men." (Tr. 12/11/03 at 13.) According to Carlow, he made that statement to everyone in the room, including the District's representative, Kinder. (Tr. 12/11/03 at 13.)
Carlow also testified to the Board that: "I remember at the end of the day I did say there were several issues not covered under the contract. Examples would be clothing allowance, certain other incentives that I know all the unions have, and I did not want to bypass that without making sure we address them." (Tr. 12/11/03 at 14.) Additionally, Carlow testified that the Union and Chief Mruk were still negotiating over certain terms of the contract. ("I was negotiating with the Chief up until May of 2002." (Tr. 12/11/03 at 14.))
Based upon the contradictory testimony of both Kinder and Carlow, there was sufficient evidence in the record for members of the Board to fail to reach an agreement, thereby resulting in a tied vote. It must be remembered that when reviewing an administrative decision, this Court is precluded from substituting its judgment on questions of fact for that of the agency. Lemoine,113 R.I. at 291, 320 A.2d at 614-15. Furthermore, a reviewing Court is prohibited from substituting its judgment for that of an agency in weighing the credibility of witnesses and the strength of the evidence. Costa v. Registry of Motor Vehicles,543 A.2d 1307, 1309 (R.I. 1988). Thus, it is not the job of this Court to weigh the credibility of either Kinder's or Carlow's testimony. Instead, it is left to the Board to weigh the competency and credibility of witnesses.
It appears that in doing so, one half of the sitting members of the Board found Kinder's testimony and the District's evidence more credible than that of Carlow's and the Union's. The other half of the Board appears to have reached the opposite conclusion. For those who believed Kinder, there was evidence to support a conclusion that there had been an offer and an acceptance to form a binding agreement; thus, when the Union failed to sign the agreement, it committed an ULP. On the other hand, others who believed Carlow to be more credible could have found that a binding agreement was not formed because Carlow testified that he told Kinder that the Tentative Agreement needed to be ratified and that it was not binding on December 9th.[10]See, Smith, 553 A.2d at 133 (holding that a contract does not arise if one party knows that the other party did not intend for his agreement to have any binding effect).
Without substituting its judgment for that of the Board members, this Court concludes that there was ample evidence in the record to support each position. Consequently, because there was no clear error of law, the Board's decision is not reversible under § 42-35-15(g) and must stand.
 Conclusion
After review of the entire record, this Court finds that the Labor Board, possessing jurisdiction to adjudicate the District's ULP complaint, did not act in excess of its statutory authority. The Court further finds that as the agency's tied vote decision resulted in a dismissal of the charge on procedural grounds, the agency's limited findings of fact did not constitute unlawful procedure. Substantial rights of the District have not been prejudiced. Accordingly, the October 14, 2004 decision of the Board is hereby affirmed.
Counsel shall submit the appropriate judgment for entry.
[1] In return, the Union agreed to withdraw, with prejudice, charges it had brought against the District for refusing to recognize the Union.
[2] The District asserts that the Tentative Agreement became a binding, final agreement. Considering that this is a dispute as to the validity and binding effect of that "agreement," and for the sake of simplicity, the Court will refer to the documents as the "Tentative Agreement."
[3] Section 28-7-13.1 provides: "It shall be an unfair labor practice for public sector employee organizations, their agents, or representatives to: . . . (2) Fail to negotiate or bargain in good faith with the duly authorized representatives of the public employer."
[4] Under ordinary conditions the Board is comprised of seven members, but because Board member Frank J. Montanaro had a conflict of interest with the Union, he was obligated to recuse himself, thus leaving a six-member panel.
[5] While the Union was the true defendant in the original charge before the Board, under §§ 28-7-29 and 42-35-15, the District was required to name the Board as a party when it appealed the Board's decision. Hereinafter, when discussed jointly, the Union and Board shall be referred to as "Appellees."
[6] A review of the record reveals that the Board made only cursory findings, but it did not base its decision on any of those particular facts. Instead, the Board held: "Since neither a motion to uphold a charge of unfair labor practice nor a motion to dismiss the complaint for cause has carried, the matter must be dismissed on procedural grounds."
[7] Indeed, this Court observes that when our Supreme Court is evenly divided on a cause, it simply announces that fact and allows the result that was appealed from to stand without commenting on the issue raised. However, pursuant to Article I, Rule 25 of the Supreme Court Rules of Appellate Procedure, an aggrieved party may petition for reargument when the Supreme Court has evenly divided. Sup. Ct. R. 25, Art. I. The Labor Relations Board, though, has no such provision particularly pertaining to tied votes of the Board members, and the Court has not been made aware of any attempt by either party to petition the Board for rehearing of the arguments.
[8] The Zoning Board of Appeals originally reached a tie vote on petitioner's application for an area variance. The Supreme Court held that the tie vote was a nonaction and remitted the matter for a second vote on the application. The Appellate division affirmed that order. On reconsideration of the matter, the Board again reached a tie decision.
[9] It also appears possible that when there is a tie vote, the Board members may not agree upon any facts, thus making it impossible for them to present formal findings of fact in their decision.
[10] The District further argues that, pursuant to the holding in Local 1199, Drug, Hospital and Health CareEmployees Union, 296 N.L.R.B. 322 (1989), the failure to understand the terms of an agreement does not excuse the misunderstood party from signing the agreement. However, that case is misapplied to the facts at hand. There, the union realized that it was binding itself to an agreement; it was simply misinformed as to the agreement's exact terms. Here, the facts are different: there is dispute as to whether the Union realized it was entering into a binding agreement or not. Thus, Local1199 does not apply, and the Court's review is limited to determining whether there was sufficient evidence to find whether the intention to be bound by the agreement existed on December 9th.
Furthermore, the District would have this Court hold the Union did not reserve the right to ratify the Tentative Agreement and therefore, there must have been a binding agreement on December 9th. However, reservation of ratification is not a dispositive issue here. Even if the Union had not reserved its ratification right, it is still possible that an agreement was not reached on December 9th, if as Carlow testified, he believed there were still several outstanding issues to resolve. Without the intent to be bound, there is no contract. Smith, 553 A.2d at 133.See also, United Furniture Workers of America,
281 N.L.R.B. 1263, 1271 (1986) ("Conversely, if the parties did not reach a `meeting of the minds' on all the substantive terms, Respondent could not be ordered to execute the agreement because the Board cannot compel concessions or agreements by parties." (citing H.K.Porter Co. v. N.L.R.B., 397 U.S. 99 (1970))).